UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

GERALDINE C. [1]

                Plaintiff,

      v.

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

Case No. 3:20-cv-00289-AC

OPINION AND ORDER

_____

ACOSTA, Magistrate Judge:

      Plaintiff Geraldine C. ("Plaintiff") filed this action under section 205(g) of the Social Security Act ("Act") as amended, 42 U.S.C. § 405(g), to review the final decision of the Commissioner of Social Security ("Commissioner") who denied her social security disability insurance benefits ("DIB") and supplemental security income ("SSI") (collectively "Benefits").

_____

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of the non-governmental party in this case.

PAGE 1 - OPINION AND ORDER

The court finds the ALJ provided clear and convincing reasons for discounting Plaintiff's testimony, offered proper justification for finding medical opinion evidence unpersuasive, and did not have a duty to obtain additional medical evidence with respect to Plaintiff's physical limitations. Accordingly, the Commissioner's final decision is supported by substantial evidence in the record and is affirmed.[2]

*Procedural Background*

On or about September 29, 2017, Plaintiff filed an application for Benefits alleging an onset date of February 28, 2017.[3] The application was denied initially, on reconsideration, and by Administrative Law Judge Cynthia D. Rosa ("ALJ") after a hearing. The Appeals Council denied review and the ALJ's decision became the final decision of the Commissioner.

*Factual Background*

Plaintiff is sixty-two years old. She completed the eleventh grade. Her past relevant work experience includes certified nurse assistant and home health care worker. Plaintiff has not been involved in a successful work attempt since February 28, 2017. She initially alleged disability because of arthritis in both knees and degenerative disc disorder and later included mental health issues. Plaintiff meets the insured status requirements entitling her to DIB through December 31, 2022.

\ \ \ \ \

\ \ \ \ \

---

[2] The parties have consented to jurisdiction by magistrate judge in accordance with 28 U.S.C. § 636(c)(1).

[3] Plaintiff subsequently amended her "alleged onset date of disability to the filing date of her application 09/27/2017," which is after she "stopped looking for work and shortly before she established primary care in October 2017." (Admin. R. at 205.)

I.  Testimony

Plaintiff completed a function report in late October 2017 ("Report"), in which she described her daily activities as "wake up take bath eat watch TV."  (Tr. of Social Security Administrative R., ECF No. 13 ("Admin. R."), at 217.)  She maintained her personal care and grooming without assistance, prepared food daily (sandwiches and frozen dinners), completed household chores (ironing, laundry), drove a car twice a week, and shopped for food, clothes, and personal items in stores for up to twenty minutes at a time.  (Admin. R. at 218-19.)  Plaintiff talked on the telephone every day and attended church every other Sunday but did not like socializing because her son was "murdered"[4] and it "hurt" her to see others enjoying their families and children.  (Admin. R. at 220-21.)  She had no difficulty paying bills, counting change, handling a savings account, or using a checkbook or money orders.  (Admin. R. at 220.)

In the Report, Plaintiff indicated her knee and back pain limited her ability to squat, bend, stand, reach, sit, kneel, and climb stairs.  (Admin. R. at 221.)  She could lift twenty pounds with her right hand and walk for twenty-five minutes before needing to rest for ten minutes.  (Admin R. at 221.)  She followed both written and spoken instructions well but had difficulty getting along with authority figures and handling stress and changes in routines.  (Admin. R. at 221-22.)  Plaintiff reported difficulty sleeping and standing for extended periods due to knee and back pain.  (Admin. R. at 217-18.)

At the April 24, 2019 Hearing before the ALJ ("Hearing"), Plaintiff testified she now lived with her husband who works as a laborer and spends her days in her bed watching television and

---

[4] On October 16, 2017, Plaintiff reported her "son was murdered nearly 20 years ago."  (Admin. R. at 277.)

crying.  (Admin. R. at 41, 47, 49.)  She reported she did not leave the house much to "socialize" as she did not want to be "bothered with" or "around" people," but drove about once a week to the grocery store or a doctor's appointment and attended church weekly.  (Admin. R. at 41-42, 48-50.) Plaintiff did not do her own grocery shopping because she was unable to stand for very long. (Admin. R. at 48, 50.)  Rather, her husband shopped from a list she provided while she sat in the car.  (Admin. R. at 48, 50.)  Except for loading the dishwasher, which Plaintiff could handle, Plaintiff's husband took care of the housework, including the cleaning, vacuuming, mopping, and laundry.  (Admin. R. at 48-49.)

Plaintiff worked for twenty-five years as a care provider in a nursing home and occasionally provided in-home care for her aunt and sister.  (Admin. R. at 44.)  Plaintiff initially testified she stopped working in early 2017 because of "too much wear and tear on my body . . . my knees and back . . . [are] giving out on me" but then admitted she "was not able to work [] because my nursing license was suspended . . . and that's all the work I ever did in my life." (Admin. R. at 44-45.)  She explained she "can't pass the background check, so I can't work," and additionally claimed she could no longer work because of back and knee pain and her "mental state is not there anymore."  (Admin. R. at 47-48.)  Plaintiff believed she could stand for fifteen-to-twenty minutes, sit about thirty minutes, and lift and carry a gallon of milk.  (Admin. R. at 53.) She explained her son died and she missed him so much she was unable to function or turn her mind off.  (Admin. R. at 54.)  She did not "want to socialize with people because of holidays and stuff . . . they got their kids, and then mine is not around" so "I don't want to be bothered with anybody."  (Admin. R. at 54.)

\ \ \ \ \

PAGE 4 - OPINION AND ORDER

II.  Medical Evidence

    *A.  Medical Providers*

        1.  Physical Health

On October 16, 2017, Plaintiff initiated care with Rebecca Glaseroff Lindsay, M.D. ("Dr. Lindsay"), for complaints of chronic knee pain and arthritis of the back.  (Admin. R. at 277.) Plaintiff reported pain with motion and tenderness in her left low back and buttocks during the examination, but Dr. Lindsay's observations were otherwise unremarkable.  (Admin. R. at 278.) Dr. Lindsay prescribed a muscle relaxant and pain medication and referred Plaintiff to physical therapy and a spine center.  (Admin. R. at 297, 299.)

On December 4, 2017, Plaintiff began physical therapy with Daniel Howard Cooper, D.P.T. ("Cooper").  (Admin. R. at 428-31.)  Plaintiff indicated she suffered from low-back pain for five years and knee pain for twenty years. (Admin. R. at 429.)  She claimed she could not stand for more than fifteen-to-twenty minutes or walk for more than fifteen-to-forty-five minutes without the onset of pain.  (Admin. R. at 429-30.)  Cooper noted Plaintiff had some limitations in exercising, walking, standing, and sleeping with a low complexity level, opined Plaintiff "will benefit from skilled PT intervention to reduce symptoms and optimize functional movement in order to resume pain free [activities of daily living] and walking," and recommended twelve additional visits over the next three months.  (Admin. R. at 431.)  The following week, Maura R. Gabriel, P.T. ("Gabriel"), added limitations in lifting, described Plaintiff's complexity as high, and recommended seven additional appointments, but also opined Plaintiff would benefit from physical therapy to resume normal activities and walking.  (Admin. R. at 423-25.)  Gabriel indicated Plaintiff's "decreased range of motion, decreased strength, decreased motor control,

decreased postural awareness, decreased awareness of body mechanics, decreased balance, abnormal gait pattern and pain is/are impairing patient's ability to walk[] and mov[e] around." (Admin. R. at 476.)  Later that month, Dr. Lindsay added medications for nerve pain and referred Plaintiff to a chronic pain program.  (Admin. R. at 373-75.)

In early January 2018, Plaintiff consulted with Melissa L. Hockett, M.S.W. ("Hockett"), a provider at a pain management clinic.  (Admin. R. at 418-19.)  Plaintiff reported she has had "all over body pain" and back and knee pain for years which she occasionally treats with a pain pill, icy hot spray, and a heating pad.  (Admin. R. at 418.)  Hockett described Plaintiff to have normal cognition and verbal presentation with relaxed, calm, open, and interested behavior.  (Admin. R. at 419.)

Michael Peter Lamore, L.C.S.W. ("Lamore"), also evaluated Plaintiff for pain management in January 2018.  (Admin. R. at 413-18.)  Plaintiff reported pain at an average level of nine which she described as aching, burning, dull, throbbing, sharp, shooting, electric, pressure, constant, numbness, tingling, and pins and needles.  (Admin. R. at 415.)  She claimed her pain increased when she moved, stood, and reclined and she did not sleep well due to achy legs, burning heels, and bad dreams.  (Admin. R. at 415.)  Plaintiff described her strengths to include her capacity to tolerate painful emotions, flexibility in thinking and behavior, expressive language and communication skills, openness, and empathy but admitted she needed to address her traumatic childhood experiences and the murder of her son.  (Admin. R. at 414.)  Lamore described Plaintiff as alert and oriented with fair eye contact, normal psychomotor activity and speech, good mood with a sad and flat affect, and good cognition, judgment, and insight. (Admin. R. at 417.)  He recommended Plaintiff participate in various coping classes, physical therapy, biofeedback,

PAGE 6 - OPINION AND ORDER

alternative therapies such as acupuncture, massage, anti-inflammatory diet, and mental health counseling.  (Admin. R. at 414.)

Dr. Lindsay examined and provided care for medical issues unrelated to Plaintiff's knee and back pain, such as diarrhea, hypertension, diabetes, night sweats, weight loss, and sexual dysfunction, from March to August 2018.  (Admin. R. at 497-98, 519, 554-71, 583-86, 594-96.) In May 2018, Plaintiff reported she is "doing well overall now that her husband is back and she has housing" and her "depression [was] improving."  (Admin. R. at 561-62.)  Dr. Lindsey consistently described Plaintiff as "alert, well appearing, [and in] no acute distress" and did not note any limitations due to Plaintiff's knee and back pain.  (Admin. R. at 556, 562, 565, 584, 594.) On at least one occasion, Dr. Lindsay noted Plaintiff had a history of "no shows and rescheduled visits" and was "very reluctant to take medications and do follow-up visits with other providers," and specifically indicated in August 2018, Plaintiff "has not see[n] psych yet for med consultation."  (Admin. R. at 498, 557, 584.)

In August 2018, Kelli Unzicker, L.C.S.W. ("Unzicker") evaluated Plaintiff for pain management.  (Admin. R. at 589.)  Plaintiff reported constant all over pain, described herself as "independent," indicated she is able to drive, and explained she "sometimes goes out with her husband but on a typical day doesn't go anywhere."  (Admin. R. at 590.)  Unzicker observed Plaintiff was oriented x 3 and relaxed and calm with a normal verbal presentation.  (Admin. R. at 591.)  Plaintiff expressed an interest in individual pain-coping sessions but was not interested in the recommended pain education group, stating "groups are difficult for her and she feels 'agitated.'"  (Admin. R. at 589-90.)

\ \ \ \ \

PAGE 7 - OPINION AND ORDER

The following month Plaintiff sought treatment from Dr. Lindsay for chronic muscular pain and knee braces for sleeping. (Admin. R. at 603.) Plaintiff reported she stopped taking prescribed medication due to side effects and was using "topicals" for pain. (Admin. R. at 604.) Dr. Lindsay recommended Plaintiff try acupuncture and provided bilateral knee immobilizers. (Admin. R. at 604, 607.) In an October 4, 2018 telephone call, Plaintiff requested resubmission of the acupuncture referral for back and knee pain, reporting her pain level at eight. (Admin. R. at 611.) A month later, Plaintiff reported the acupuncture was "really helping," she was "sleeping better, feels more relaxed, doing well" and "is really happy with how she feels." (Admin. R. at 614.) Dr. Lindsay again described Plaintiff as "alert, well appearing, no acute distress" as well as "cheerful" with "no feelings of depression. (Admin. R. at 615.) Dr. Lindsay approved Plaintiff's request for more acupuncture visits. (Admin. R. at 614-15.) On November 15, 2018, Plaintiff again stated acupuncture helped and indicated she "easily falls asleep, sleeps through the night and feels rested upon awakening." (Admin. R. at 618, 624.)

2. Mental Health

On October 16, 2017, Plaintiff participated in a mental health consultation with Heidi Hunt Travis, L.P.C. ("Travis"), who diagnosed Plaintiff with major depressive disorder, recurrent episode, severe, and referred Plaintiff to Cascadia Mental Health ("Cascadia"). (Admin. R. at 275.) Cascadia provider Tyler Boyer, Q.M.H.P. ("Boyer") evaluated Plaintiff on November 6, 2017. (Admin. R. at 318-25.) Plaintiff indicated her primary goal was "to be able to look at a picture of my son without it hurting so much and come to terms with the fact that he's gone" and reported additional stressors, including her sister's recent death, homelessness, lack of income, diabetes diagnosis, and her husband's upcoming release from prison. (Admin. R. at 318.) Plaintiff

stated she "would like to focus on vocational goals while in treatment," was "going to PCC trying to get her GED right now," and stated her strength is "knowing I'm strong and I've held up all these years.  I am a strong person and I can overcome things."  (Admin. R. at 321.)  Boyer noted Plaintiff's appearance, speech, and tone were appropriate; she was friendly, oriented to person, place, time, and circumstances, with a goal-directed thought process and average intellectual level; and displayed signs of a good attention span, intact memory, and fair judgment.  (Admin. R. at 323-24.)  Boyer diagnosed Plaintiff with "Adjustments Disorders; Persistent (chronic); With depressed mood" and recommended individual and group counseling and medication services to help with sleep.  (Amin. R. at 325.)

Plaintiff initiated treatment with Kent Kreiselmaier, M.A., Q.M.H.P., another Cascadia provider ("Kreiselmaier"),[5] in mid-November 2017.  (Admin. R. at 542.)  Plaintiff's stated goals of treatment were to learn skills to cope with her symptoms, come to terms with her son's death, and obtain housing, and she described a successful outcome as:  "Be myself again. Support myself again.  Cook for people again.  Get my life back, and be independent again."  (Admin. R. at 542-43.)  Kreiselmaier described Plaintiff as friendly, cooperative, and oriented to person, place, time, and circumstance but tearful when talking about her son.  (Admin. R. at 543.)  He recommended individual and group counseling as well as assistance connecting with community resources. (Admin. R. at 542-43.)  Kreiselmaier described Plaintiff as "significantly distressed" on November 27, 2017, because she had just received notice her claim for Benefits was denied and was concerned her lack of income would complicate her applications for housing.  (Admin. R. at 538.)

---

[5] Plaintiff refers to Kreiselmaier as her "treating provider."  (Pl.'s Mem. in Supp. of the Pet. for Review, ECF No. 14 ("Pl.s' Mem."), at 9.)

Plaintiff provided Keiselmaier a Mental Capacity Assessment form that her lawyer wanted him to complete in support of her appeal of the denial of Benefits.  (Admin. R. at 538.)  Keiselmaier provided Plaintiff a packet of websites and phone numbers for community resources and discussed ways for Plaintiff to cope with and regulate her anxiety and distress, which he believed "solved" the problem.  (Admin. R. at 538.)

On December 14, 2017, Kreiselmaier "spent the entire session gathering information about client's work history and MY-related problems encountered on the job in order to be able to fill out the Mental Capacity Assessment form provided by her SSDI lawyer" and noted Plaintiff "described a long history of conflict, insubordination, and even physical fighting at past CNA jobs that have resulted in her being fired" and "anger problems, lack of concentration, and lack of affect regulation" which Plaintiff related to her "ongoing depression and PTSD[6] symptoms."  (Admin. R. at 532.)

On December 28, 2017, Cascadia provider Kathleen Sullivan-Conger, P.M.H.N.P. (Sullivan-Conger"), performed a psychiatric assessment of Plaintiff.  (Admin. R. at 526-29.) Sullivan-Conger noted Plaintiff described symptoms of PTSD from as young as nine years old due to exposure to violence and loss of loved ones, including severe nightmares and disrupted sleep patterns, but that she denied muscular problems or skeletal pain.  (Admin. R. at 526, 528.) Sullivan-Conger observed Plaintiff had a steady gait, appropriate eye contact, linear and organized thought process, intact memory, and good focus, but appeared tired with a depressed mood. (Admin. R. at 528.)  Sullivan-Conger diagnosed Plaintiff with "Adjustment Disorders; Persistent

---

[6] "PTSD" stands for post-traumatic stress disorder.

(chronic); With depressed mood," prescribed medication for depression and sleep issues, and recommended individual and group counseling for depressed mood, racing thoughts, and grief. (Admin. R. at 526.) Kreiselmaier provided counseling services later that day. (Admin. R. at 530.) Kreiselmaier noted Plaintiff enjoyed her Christmas holiday, appeared more tired, but was still euthymic and had a positive frame of mind. (Admin. R. at 530.) Kreiselmaier also offered a PTSD diagnosis and provided education on the symptoms and nature of PTSD. (Admin. R. at 530.)

On January 8, 2018, Kreiselmaier completed the Mental Capacity Assessment form indicating the degree to which Plaintiff was limited by psychological factors only ("Assessment"). (Admin. R. at 407-09.) In the Assessment, Kreiselmaier indicated Plaintiff suffered from an adjustment disorder, persistent, with depressed mood, and then addressed the four areas of mental health limitations. (Admin. R at 407-09.)

With respect to understanding, remembering, or applying information, Kreiselmaier did not know if Plaintiff was limited in her ability to follow one- or two-step oral instructions but found her moderately limited in her ability to recognize a mistake and correct it, identify and solve problems, sequence multi-step activities, and use reason and judgment to make work-related decisions. (Admin. R at 407.) He then expressly noted these limitations are based on Plaintiff's description of her abilities: "Per self-report, client describes a pattern of cognitive-attentional impairments that appear to relate to depressive and trauma-related symptoms and events. Per her report, these cognitive impairments have affected her memory and performance at work." (Admin. R at 407.)

Kreiselmaier indicated Plaintiff was markedly limited in her ability to ignore or avoid distractions while working, sustain an orderly routine, maintain regular attendance at work, and

PAGE 11 - OPINION AND ORDER

work a full day without needing more than the allotted number or length of rest periods; moderately limited in her ability to initiate and perform a task she knows how to do and work at an appropriate and consistent pace, or complete tasks in a timely manner; and mildly limited in her ability to work close to or with others without interrupting or distracting them.  (Admin. R at 408.)  Kreiselmaier again specifically noted: "Client described a history of concentration impairments likely related [to] her depressive symptoms and trauma-related events.   Her cognitive concentration and perseverance impairment has negatively affected her performance at work, resulting in reprimands."  (Admin. R at 408.)

In the area of adapting or managing oneself, Kreiselmaier reported Plaintiff was markedly limited in her ability to manage psychologically based symptoms; mildly limited in her ability to set realistic goals; and not limited in her ability to adapt to changes, distinguish between acceptable and unacceptable work performance, make plans independently of others, maintain personal hygiene and attire appropriate to a work setting, be aware of normal hazards, and take appropriate precautions.  Kreiselmaier commented: "Client denied most adaptation management difficulties during assessment.   Work impairments do not appear to have resulted from these type of symptoms."  (Admin. R at 408.)

Kreiselmaier relied, at least in part, on his own observation of Plaintiff in identifying limitations interacting with others, explaining: "Client has exhibited a pronounced lack of affect and anger regulation capacity multiple times during therapy sessions.  These include intense anger and verbal pronouncements and exhortations."  (Admin. R. at 409.)  However, Kreiselmaier also offered Plaintiff's self-reports as support, noting: "Client also detailed a severe history of anger and physical violent outbursts at work, resulting in termination and legal problems."  (Admin. R

PAGE 12 - OPINION AND ORDER

at 409.)  He opined Plaintiff had extreme limitations in her ability to handle conflicts with others and keep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness and markedly limited in her ability to cooperate with others, ask for help when needed, understand and respond to social cues, and respond to requests, suggestions, criticism, correction, and challenges.  (Admin. R at 409.)

Sullivan-Conger met with Plaintiff for a medication review on January 17, 2018.  (Admin. R. at 524.)  Plaintiff complained of "feeling drowsy all day," explaining she took her medication at 8:00 p.m., stayed up until 2:00 a.m., woke up at 4:00 a.m., and then slept during the day, indicated improvement in her depression and anxiety, but reported little change in her pain level. (Admin. R. at 524.)  Other than depression, Sullivan-Conger observed no abnormalities in her mental health evaluation.  (Admin. R. at 524.)  Sullivan-Conger instructed Plaintiff on proper sleep habits and made a change in her medication.  (Admin. R. at 524.)

From February to July 2018, Cascadia reached out to Plaintiff encouraging her to schedule an appointment.  (Admin. R. at 655-57.)  Kreiselmaier authored a discharge plan for Plaintiff on November 2, 2018, noting Plaintiff sought treatment "to treat her grief and posttraumatic stress symptoms and to acquire housing," "attended 4 individual therapy session[s], and no showed 2 sessions," and "left [treatment] against professional advice."  (Admin. R. at 654.)  Kreiselmaier indicated Plaintiff's prognosis was fair based on some insight into her symptoms and long history of employment, but acknowledged the existence of negative factors, including history of abuse, anger outbursts, and involvement in the criminal justice system.  (Admin. R. at 654.)

On January 8, 2019, Plaintiff called Cascadia to report she was out of medication and seeking a change in medication.  (Admin. R. at 653.)  She claimed she was upset and "restraining

herself" from engaging in a physical fight with a girl who refused to return Plaintiff's personal property to her.  (Admin. R. at 653.)

   *B.  Reviewing Physicians*

   Neal E. Berner, M.D. ("Dr. Berner"), reviewed Plaintiff's medical records and on November 17, 2017, opined Plaintiff suffered from the non-severe impairments of dysfunction of major joints and personality and impulse-control disorders.  (Admin. R. at 67.)  He noted her "functional limitations are not consistent with evidence" as the "Xray of [her] knees shows only mild changes which would not cause the exten[t] of her limitations" and Plaintiff is "able to drive, goes to stores for food, clothes and personal items taking 10-20 minutes to shop, does some light household chores, manages money, goes to church, talks with family, has supportive spouse." (Admin. R. at 66.)  On the same date, Susan M. South, Psy.D. ("Dr. South"), found Plaintiff was only mildly limited in her ability to concentrate, persist, or maintain pace and not limited in her ability to understand, remember, apply information, interact with others, or adapt or manage herself.  (Admin. R. at 68.)  Dr. Berner found Plaintiff was not disabled through November 20, 2017.  (Admin. R. at 79.)

   In a report dated January 12, 2018, Thomas W. Davenport, M.D. ("Dr. Davenport"), another reviewing physician, agreed with the diagnoses and conclusions of Dr. Berner.  (Admin. R. at 85-87.)  Similarly, Winifred C. Ju Ph.D. ("Dr. Ju"), concurred in the limitations identified by Dr. South.  (Admin. R. at 87-88.)

   *C.  Test Results*

   X-rays of Plaintiff's knees taken on October 16, 2017, revealed possible "mild narrowing of the medial and lateral joint spaces" with intact osseous structures and no osteophyte formation

or other acute finding.  (Admin. R. at 282-83.)  A January 28, 2018 MRI of Plaintiff's lumbar spine showed no fractures or destructive lesions and normal alignment but "chronic multilevel degenerative changes throughout the lumbar spine, causing mild spinal canal and neural foraminal narrowing at all lumbar levels."  (Admin. R. at 515.)  The reviewing physician opined "asymmetric disc and spur complex and left neural foramen at the L5-S1 level potentially could be a source of radicular symptoms."  (Admin. R. at 515.)

III.  Vocational Evidence

Patricia V. Ayerza, M.B.A., C.R.C., A.B.V.E., a vocational rehabilitation counselor ("Ayerza"), appeared by telephone at the Hearing and indicated Plaintiff's past relevant work of nurse aide and home health worker as performed ranged from heavy- to light-level work.  (Admin. R. at 56-59.)  The ALJ asked Ayerza if a hypothetical individual of Plaintiff's age, education, and work experience able to perform medium work with additional restrictions of occasional climbing of ropes, ladders, and scaffolds; frequent stooping, crawling, and kneeling; and limited exposure to fumes, gases, dust, odors and other pulmonary irritants could perform Plaintiff's past work.  (Admin. R. at 60.)  Ayerza testified such an individual would be able to perform Plaintiff's past work as a home attendant nurse aide.  (Admin. R. at 60.)

IV.  ALJ Decision

The ALJ acknowledged Plaintiff had not engaged in substantial gainful activity since the alleged onset date of February 28, 2017.  (Admin. R. at 18.)  She then found Plaintiff suffered from the severe impairments of "mild osteoarthritis of the knees; degenerative changes of the lumbar spine; history of asthma; [and] obesity" but that her "medically determinable impairments of posttraumatic stress disorder [and] adjustment disorder with depressed mood, considered singly

and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere."  (Admin. R. at 19.)  While conceding Plaintiff's physical impairments limited her ability to perform basic work activities, the ALJ found such impairments did not meet or equal the severity of any listed impairment.  (Admin. R. at 18, 21-22.)  As a result of her impairments, the ALJ considered Plaintiff capable of performing work at a medium[7] exertional level, including frequent stooping, crawling, and kneeling; but of only occasional climbing of ropes, ladders, or scaffolds; and of limited exposure to fumes, gasses, dust, odors, and other pulmonary irritants.  (Admin. R at 22.)  The ALJ deemed Plaintiff capable of performing her past relevant work as a nurse aide and home health care worker.  (Admin. R. at 26.)  Consequently, she found Plaintiff not disabled from February 28, 2017, through the date of the June 12, 2019 decision.  (Admin. R. at 26-27.)

The ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Admin. R. at 23.)  The ALJ discounted Plaintiff's testimony on the limiting effects of her "disabling symptoms."  (Admin. R. at 23.)  The ALJ explained Plaintiff "has some restrictions, but the allegations concerning her incapacity are not borne out by the objective evidence of record, the well-considered medical opinions, or the consistency of her own reported and demonstrated functional ability."  (Admin. R. at 23.)

---

[7] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. 404.1567(c) (2020).

PAGE 16 - OPINION AND ORDER

The ALJ noted Plaintiff testified at the Hearing "that, due to her mental health issues, she does nothing all day but stay in bed, watch television, and smoke two packs of cigarette per day" and also reported "her mind does not shut off, she cannot focus, she cries all of the time, and . . . she does not want to be around other people." (Admin. R. at 19.)  The ALJ then found these "extreme limitations" not supported by Plaintiff's own statements and testimony. (Admin. R. at 19.) Specifically, the ALJ identified Plaintiff's reports she was in the process of getting her GED; attended church every week; accompanied her husband on errands; regularly watched television; prepared her own meals; was able to pay bills, count change, handle a savings account, and use a checkbook or money orders; talked with people on the phone every day; and did not need reminders to take care of her personal needs, maintain her grooming, or take medication as contrary to Plaintiff's reported limitations. (Admin. R. at 19.)  The ALJ commented on Plaintiff's failure to report any "difficulties with her mental abilities such as memory, completing tasks, concentration, understanding, following instructions, using hands, and getting along with others" in the Report and her identification of her strengths during a January 2018 referral appointment as: "Capacity to tolerate painful emotions, Flexibility in thinking and behavior, Good expressive language and communication skills, Capacity for openness, [and] Good capacity for empathy." (Admin. R. at 19.)  Additionally, the ALJ noted Plaintiff "stopped working not because of her alleged impairment but, rather, because her nursing license had been suspended," and that she testified "she would have continued to work at her prior job" had she not lost her license. (Admin. R. at 19-20.)

The ALJ also found Plaintiff's reported limitations in her mental functioning were not supported by the medical record. (Admin. R. at 20.)  The ALJ found the opinions offered by Dr.

South and Dr. Ju that Plaintiff's mental health impairments were not severe "very persuasive because they are consistent with and supported by the claimant's medical record." (Admin. R. at 20.) The ALJ expressly relied on mental status examinations of Plaintiff from November 2017, December 2017, January 2018, and August 2018, all of which were unremarkable and "suggest[] that her mental health issues do not cause significant impact on her mental functioning." (Admin. R. at 20.) She expressly found "the claimant has no limitation in her ability to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage oneself." (Admin. R. at 21.)

The ALJ acknowledged Kreiselmaier, Plaintiff's treatment counselor, submitted the Assessment in January 2018 indicating "the claimant was markedly limited in her capacity for concentration, persistence, and pace; not significantly limited in her capacity for adapting or managing herself; moderately limited in her ability to understand, remember, and apply information; and markedly to extremely limited in her capacity for social interaction." (Admin. R. at 21.) However, the ALJ found that opinion unpersuasive because Kreiselmaier "repeatedly indicated that all of the responses provided were based on the claimant's self report, rather than on Mr. Kreiselmaier's own independent determination," and that "the claimant is not a reliable source of information regarding the extent of her functional limitations." (Admin. R. at 21.) The ALJ also found "the moderate to extreme functional limitations set forth therein are simply inconsistent with [] the claimant's typically normal status examinations." (Admin. R. at 21.)

*Standard of Review*

The Act provides for payment of DIB to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1) (2020). In

addition, under the Act, SSI may be available to individuals who are age sixty-five or over, blind, or disabled, but who do not have insured status under the Act.  42 U.S.C. § 1382(a) (2020).  The burden of proof to establish a disability rests upon the claimant.  *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.), *cert. denied*, 519 U.S. 881 (1996) (DIB); *Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992) (SSI).  To meet this burden, the claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months.  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A) (2020).  An individual will be determined to be disabled only if there are physical or mental impairments of such severity that the individual is not only unable to do previous work but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2) (A) and 1382c(a)(3)(B) (2020).

The Commissioner has established a five-step sequential evaluation process to use for determining whether a person is eligible for either DIB or SSI because he or she is disabled.  20 C.F.R. §§ 404.1520 and 416.920 (2020); *Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (DIB); *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989) (SSI).  First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity."  If the claimant is engaged in such activity, Benefits are denied.  Otherwise, the Commissioner proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, Benefits are denied.

PAGE 19 - OPINION AND ORDER

If the impairment is severe, the Commissioner proceeds to the third step to determine whether the impairment is equivalent to one of the specifically listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the Commissioner proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant has performed in the past. If the claimant can perform work which he or she has performed in the past, a finding of "not disabled" is made and Benefits are denied. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

If the claimant is unable to do work performed in the past, the Commissioner proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy considering his or her age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. *Distasio v. Shalala*, 47 F.3d 348, 349 (9th Cir. 1995) (DIB); *Drouin*, 966 F.2d at 1257 (SSI). The claimant is entitled to Benefits only if he or she is not able to perform other work. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

When an individual seeks either DIB or SSI because of disability, judicial review of the Commissioner's decision is guided by the same standards. 42 U.S.C. §§ 405(g) and 1383(c)(3). The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g) (2020); *Batson* v. *Comm'r of the Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." *Robbins*

v. *Soc. Sec. Admin.,* 466 F.3d 880, 882 (9th Cir. 2006). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Tylitzki* v. *Shalala,* 999 F.2d 1411, 1413 (9th Cir. 1993).

The reviewing court may not substitute its judgment for that of the Commissioner. *Robbins,* 466 F.3d at 882; *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir. 2001). Thus, where the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld, even where the evidence can support either affirming or reversing the ALJ's conclusion. *Burch v. Barnhart,* 400 F.3d 676, 679 (9th Cir. 2005). The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995). In determining a claimant's residual functioning capacity, an ALJ must consider all relevant evidence in the record, including, *inter alia,* medical records, lay evidence, and "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins,* 466 F.3d at 883, *citing* SSR 96-8p, 1996 WL 374184, at *5; 20 C.F.R. §§ 404.1 545(a)(3), 416.945(a)(3); *Smolen v. Chater,* 80 F.3d 1273, 1281 (9th Cir.1996). However, the reviewing court must consider the entire record as a whole, weighing both the evidence that supports and detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence. *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035 (9th Cir. 2007).

## *Discussion*

Plaintiff asserts the ALJ erred by failing to properly weigh medical evidence in finding Plaintiff did not have a severe mental impairment at step two and failing to rely on proper opinion evidence when assessing her residual functional capacity ("RFC"). Plaintiff asks the court to

remand the matter for further administrative proceedings, including a *de novo* hearing and decision. The Commissioner contends the ALJ properly considered the evidence in accordance with the terms of the Act and related regulations and the decision should be affirmed.

I.  Severe Mental Impairment

At step two, a claimant is not disabled if the Commissioner determines the claimant does not have any medically severe impairment or combination of impairments. *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006); *Murray v. Comm'r Soc. Sec. Admin., 226* F. Supp. 3d 1122, 1129 (D. Or. 2017); 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). A severe impairment "significantly limits" a claimant's "physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment is not severe "when [the] medical evidence establishes only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." Social Security Ruling (SSR) 85-28, *available at* 1985 WL 56856, at *3. The step two threshold is low; "[s]tep two is merely a threshold determination meant to screen out weak claims." *Buck v. Berryhill*, 869 F.3d 1040, 1048 (9th Cir. 2017); *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (noting step two is a "de minimus screening device to dispose of groundless claims."). The Plaintiff has the burden to show that she has a medically severe impairment or combination of impairments at step two. *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).

Where a claimant presents a colorable claim of mental impairments, the ALJ must determine whether the claimant has a medically determinable mental impairment and rate the degree of functional limitation in four areas utilizing the "psychiatric review technique" or the "paragraph B" criteria. *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 725 (9th Cir. 2011)

(citing 20 C.F.R. § 404.1520a).  Effective March 27, 2017, the Social Security Administration ("SSA") revised the paragraph B criteria for assessing mental functioning.  20 C.F.R. § 404.1520a (2020).   Under the new paragraph B criteria, evaluators examine a claimant's ability to: "understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).  The degree of functional limitation in these four areas is rated utilizing a five-point scale – none, mild, moderate, marked, and extreme – with "none" or "mild" typically resulting in the ALJ finding the mental impairments are not severe.    20 C.F.R. §§ 404.1520a(c)(4), 404.1520a(d)(1), 416.920a(c)(4), 416.920a(d)(1).

Plaintiff asserts the ALJ erred at step two by overruling diagnoses, treating source opinions, and positive clinical findings to conclude that Plaintiff did not have a severe mental impairment. The ALJ expressly acknowledged Plaintiff suffered from the "medically determinable impairments" of PTSD and adjustment disorder.  He then rated Plaintiff's functional limitations under the proper paragraph B criteria, determined she was not limited in any of the four relevant areas of mental functioning, and found Plaintiff's mental impairments not severe at step two. Consequently, the ALJ considered Plaintiff's mental impairment under the relevant standard. However, according to Plaintiff, the ALJ failed to properly consider medical evidence of her depression, PTSD, or adjustment disorder, the opinion of Kreislemaier contained in the Assessment, and Plaintiff's testimony describing her limitations when rating her functional limitations.  The Commissioner contends the ALJ's step two findings are supported by substantial evidence and should not be disturbed.

\ \ \ \ \

PAGE 23 - OPINION AND ORDER

*A. Plaintiff's Testimony*

Plaintiff argues the ALJ erred by failing to identify specific, clear, and convincing reasons supported by substantial evidence in the record to discount her subjective symptom testimony with respect to her mental health limitations.[8]  To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must perform two stages of analysis.  *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017); 20 C.F.R. § 416.929 (20209).  The first stage is a threshold test in which the claimant must produce objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged.  *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012); *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008). At the second stage, absent affirmative evidence the claimant is malingering, the ALJ must provide clear and convincing reasons for discrediting the claimant's testimony regarding the severity of the symptoms.  *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008); *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).  The ALJ must make sufficiently specific findings to permit the reviewing court to conclude the ALJ did not arbitrarily discredit the claimant's testimony.  *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015).  Factors the ALJ may consider when making such credibility determinations include the objective medical evidence, the claimant's treatment history, the claimant's daily activities, and inconsistencies in testimony.  *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014); *Tommasetti*, 533 F.3d at 1039.

"Credibility determinations are the province of the ALJ" and the court may not "second-guess" the ALJ's determination if they have made specific findings that are supported by

---

[8] The ALJ also offered reasons for discounting Plaintiff's subjective symptom testimony with respect to her physical health limitations.  Plaintiff does not challenge those reasons or that finding.

substantial evidence in the record.  *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989).  The overall credibility decision may be upheld even if not all of the ALJ's reasons for rejecting a claimant's testimony are upheld.  *Batson*, 359 F.3d at 1197.  An ALJ needs only one valid reason for rejecting a claimant's subjective testimony with respect to symptoms and resulting limitations.  *See Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004) (ALJ's decision to discredit symptom testimony may be upheld where specific justification not upheld if ALJ provided other valid rationale).

The ALJ acknowledged Plaintiff's medically determinable mental impairments of PTSD and adjustment disorder with depressed mood, impliedly found they could cause some limitation in Plaintiff's ability to perform basic mental work activities, and did not identify any evidence to establish Plaintiff was malingering.  (Admin. R. at 18.)  Consequently, the ALJ was required to offer clear and convincing reasons for rejecting Plaintiff's testimony with respect to the limitations supported by objective evidence.  To meet this standard, "[t]he ALJ must specify what testimony is not credible and identify the evidence that undermines the claimant's complaints – '[g]eneral findings are insufficient.'"  *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005), (quoting *Reddick v. Chater*, 157 F.3d 715,722 (9th Cir. 1998)); *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991) (*en banc.*)  ("[A] reviewing court should not be forced to speculate as to the grounds for an adjudicator's rejection of a claimant's allegations of disabling pain.")

### 1.  Inconsistent Testimony

An ALJ may consider a range of factors in assessing credibility, including prior inconsistent statements concerning symptoms and other testimony by the claimant that appears less than candid.  *Ghanim v. Colvin*, 763 F.3d at 1163 (9th Cir. 2014) (citing *Smolen v. Chater*, 80

F.3d 1273, 1284 (9th Cir. 1996).  Plaintiff argues the ALJ improperly relied on Plaintiff's statement she stopped working as a nurse assistant because she lost her license, as evidence Plaintiff remained mentally capable of performing the duties of her past relevant work.  Plaintiff asserts the ALJ ignored Plaintiff's other testimony that at the time she stopped working, she was deteriorating to the point she felt she would not be able to continue working and her mental state "was not there anymore."  (Pl.'s Mem. of Law, ECF No. 14 ("Pl.'s Mem."), at 10.)  First, Plaintiff did not initially claim Benefits due to mental health issues.  She first identified her mental health issues in late 2017, providing support for the ALJ's conclusion Plaintiff was not limited by her mental health issues at the time she stopped working.  Second, Plaintiff's testimony she was deteriorating and unable to continue working related solely to an injury to her back and arthritis in her knees causing her to sit down on the job, not to limitations resulting from her mental health.  Third and finally, Plaintiff testified at the hearing her mental state then prevented her from working full-time, which testimony is not necessarily contrary to the ALJ's finding Plaintiff's mental health was not a factor in Plaintiff's inability to work in early 2017.

Additionally, the ALJ found Plaintiff's description of her "strengths" in early 2018, which included "good expressive language skills" and good capacity for "openness" and "empathy," and her failure to list difficulties with memory, completing tasks, understanding, and following instructions in the Report, were contrary to her description of her extreme limitations.  The ALJ's reliance on Plaintiff's inconsistent testimony of the reason she no longer was able to work as a nurse assistant, and her strengths, as well as her failure to list various issues in the Report, is supported by the record, particularly when considered in the context of Plaintiff's mental health limitations.

PAGE 26 - OPINION AND ORDER

2. Reported Daily Activities

The ALJ found Plaintiff's description of her daily activities to be inconsistent with her testimony regarding her mental health limitations.  An ALJ may use a claimant's daily activities to reject her subjective symptom testimony on either of two grounds: (1) if the reported activities contradict the claimant's other testimony; or (2) if the activities meet the threshold for transferable work skills.  *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007).  The ALJ was justified in discrediting Plaintiff's subjective testimony as contradictory of limitations resulting from her mental impairments.

Plaintiff testified she spent her days in bed, watching television and smoking, and had difficulty concentrating and interacting with others.  The ALJ found Plaintiff's reports she attended church weekly, talked on the phone with people every other day, and accompanied her husband on errands to be inconsistent with her lack of desire to socialize or difficulty dealing with others. With respect to her inability to concentrate, the ALJ identified Plaintiff's statement she was in the process of getting her GED and her claim she watched television all day as evidence contradictory to Plaintiff's reported limitation.

The ALJ specifically identified daily activities which she believed were inconsistent, at least to some degree, with Plaintiff's testimony regarding limitations resulting from her mental impairments which she claims prevent her from working.  While one could view Plaintiff's reports of her daily living activities as somewhat consistent with the limitations she describes, the evidence also supports a finding to the contrary.  The ALJ is responsible for determining credibility and where evidence exists to support the ALJ's finding, the court may not substitute its own judgment or second-guess the ALJ.  The court finds the ALJ properly discounted Plaintiff's testimony on

PAGE 27 - OPINION AND ORDER

her inability to interact with others or concentrate as inconsistent with her description of her activities of daily living.

### 3. Inconsistent with Medical Records

The ALJ also discounted Plaintiff's testimony based, in part, on medical evidence she considered inconsistent with the claimed severity of Plaintiff's limitations.  As explained above, the ALJ may engage in ordinary techniques of assessing a witness's credibility "such as weighing inconsistent statements regarding symptoms by the claimant." _Smolen,_ 80 F.3d 1284.  Thus, it is not legally impermissible to give a claimant's testimony reduced weight because that testimony contradicts the objective medical evidence in the record.  _Id._  However, the ALJ may not "make a negative credibility finding 'solely because' the claimant's symptom testimony 'is not substantiated affirmatively by objective medical evidence.'"  _Stockwell v. Colvin,_ No. 3:13–cv–01220–HZ, 2014 WL 6064446, at *3 (D. Or. Nov. 11, 2014).

The ALJ specifically found Plaintiff's "medical record does not support that her mental health conditions significantly restricted her mental functioning."  (Admin. R. at 20.)  The ALJ relied on Dr. South and Dr. Ju's opinions Plaintiff's "alleged mental health impairments were not severe," finding the opinions "very persuasive because they are consistent with and supported by the claimant's medical record."  (Admin. R. at 20.)  The ALJ noted the November 2017 mental status examination was "unremarkable" and consistent with other mental health examinations assessing Plaintiff's mental functioning to be "within normal limits with regard to her thought process and content, her orientation, her memory, her fund of knowledge, her concentration, her abstract thought, and her insight and judgment."  (Admin. R. at 20.)

\ \ \ \ \

PAGE 28 - OPINION AND ORDER

Plaintiff asserts the ALJ erred by ignoring medical records showing she repeatedly suffered from an abnormal mood and affect, hallucinations, and suicidal ideation.  However, Plaintiff's citations to the record do not entirely support this assertion.  For example,  Plaintiff cites to Lamore's January 2018 evaluation and notes which indicate Plaintiff reported hallucinations and occasional suicidal thoughts and had a "sad and flat," but also noted Plaintiff's mood and insight were "good," her cognition was "alert, intact, and good," her judgment was "good/socially appropriate," and she had a linear thought process and was oriented with fair eye contact.  (Admin. R. at 417, 492-93.)  Similarly, Plaintiff relies on a January 2018 service note from Cascadia which described her as depressed but also indicate "no abnormalities present throughout" the "mental status examination."  (Admin. R. at 524-25.)   The December 2017 assessment by Cascadia reported Plaintiff appeared tired, with a flat affect, and a depressed mood while also observing Plaintiff denied suicidal ideation, was alert, oriented and future focused, and had appropriate eye contact and a linear thought process,  (Admin. R. at 528.)

The medical records relied on by both the ALJ and Plaintiff reveal that while Plaintiff had some issues with depression and occasional thoughts of suicide or hallucinations, they were not pervasive and did not limit her to the degree she described.  As a result, Plaintiff's testimony regarding the severity of her mental limitations is inconsistent with the medical records and clinical findings cited by the ALJ and, to some degree, those Plaintiff herself cited.  Consequently, the ALJ did not err in relying on such medical evidence as a reason for discounting Plaintiff's testimony.

### B.  The Assessment

Plaintiff also argues the ALJ erred in failing to adopt the degree of limitations identified by Kreiselmaier in the Assessment.  Plaintiff filed her application for Benefits in September 2017.

PAGE 29 - OPINION AND ORDER

"For claims filed on or after March 27, 2017, Federal Regulation 20 C.F.R. 416.920c governs how an ALJ must evaluate medical opinion evidence." *Tyrone W. v. Saul*, No. 3:19-cv-01719-IM, 2020 WL 6363839, at * 6 (D. Or. Oct. 28, 2020) (citing *Revisions to Rules Regarding the Evaluation of Medical Evidence* ("*Revisions to Rules*"), 2017 WL 168818, 82 Fed. Reg. 5844, at *5867-68 (Jan. 18, 2017)); *see also Linda F. v. Saul*, No. C20-5076-MAT, 2020 WL 6544628, at *2 (W.D. Wash. Nov. 6, 2020) ("Because plaintiff filed her applications after March 27, 2017, new regulations apply to the ALJ's evaluation of medical opinion evidence."). The new regulations provide the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from your medical sources." *See* 20 C.F.R. § 404.1520c(a) (2020). Instead, the Commissioner must consider all medical opinions and "evaluate the persuasiveness" of such opinions using the factors specified in the regulations. 20 C.F.R. § 404.1520c(b) (2020). Those factors include "supportability," "consistency," "relationship with the claimant," "specialization," and "other factors." 20 C.F.R. § 404.1520c(a). The factors of "supportability" and "consistency" are "the most important factors" in the evaluation process. 20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).

The regulations require ALJs to "articulate . . . how persuasive [they] find all of the medical opinions" and "explain how [they] considered the supportability and consistency factors." 20 C.F.R. §§ 404.1520c(b). The ALJ is not required to explain how he or she considered the secondary factors unless he or she finds that two or more medical opinions about the same issue are equally well-supported and consistent with the record but not identical. 20 C.F.R. §§ 404.1520c(b)(3). The court must, however, continue to consider whether the ALJ's analysis has

the support of substantial evidence.  *See* 42 U.S.C. § 405(g); *see also Hammock*, 879 F.2d 498, 501 (9th Cir. 1989).

The ALJ found Kreiselmaier's opinion unpersuasive because it was based on Plaintiff's reports, not Kreiselmaier's independent observations.  (Admin. R. at 21.)  Plaintiff argues the Assessment was based on Kreiselmaier's findings that Plaintiff exhibited "a pronounced lack of affect and anger regulatory capacity multiple times during therapy sessions," exhibited by intense anger, verbal pronouncements, and explosions.  (Pl.'s Mem. at 11.)

It appears from the record Kreiselmaier met with Plaintiff three times before he completed the Assessment.  The first meeting was the initial assessment, the second was after Plaintiff's application for Benefits was denied and she was concerned about her lack of income and housing, and the third was spent gathering information from Plaintiff to complete the Assessment.  In the Assessment, Kreiselmaier makes very clear he is relying on Plaintiff's self-reports to evaluate her limitations in the areas of understanding, remembering or applying information; concentration, persistence, or maintaining pace; and adapting and managing oneself.  (Admin. R. at 407-08.)  He does appear to rely to some degree on his own observations of Plaintiff's ability to interact with others but also identified Plaintiff's detailed and severed history of anger and violent outbursts at work as evidence to support his finding of marked or extreme limitation in this area.  (Admin. R. at 409.)

The court has found the ALJ properly discredited Plaintiff's description of her limitations resulting from her mental health impairments.  Consequently, to the extent Kreiselmaier relied on Plaintiff's self-reports in assessing her limitations, his opinion is also suspect.  The ALJ's finding Kreiselmaier's opinion is unpersuasive is supported by the record.

Additionally, the ALJ found Kreiselmaier's opinion unpersuasive because it was inconsistent with Plaintiff's "typically normal mental status examinations." (Admin. R. at 21.) Plaintiff again argues the ALJ failed to "acknowledge any of the positive clinical findings in the record of Plaintiff's mental impairment." (Pl.'s Mem. at 11.) The court has addressed this argument and found the ALJ's conclusion the mental status examinations were generally "unremarkable" and inconsistent with the extreme limitations described by Plaintiff is supported by the record. This finding applies equally to Kreiselmaier's opinion on Plaintiff's limitations as described in the Assessment.

The court finds the ALJ properly weighed the medical evidence, did not err by finding Kreiselmaier's opinion unpersuasive or in relying on the reviewing physician's opinions, and provided the necessary support to discount Plaintiff's testimony. Accordingly, the ALJ's conclusion Plaintiff did not have a severe mental impairment at step two was proper.

## II. Residual Functional Capacity

Plaintiff also argues the ALJ's RFC assessment was not supported by substantial evidence. Specifically, Plaintiff asserts the lack of medical evidence on Plaintiff's physical limitations is fatal to the ALJ's RFC assessment. It is undisputed the record is void of opinion evidence describing limitations resulting from Plaintiff's physical ailments.

The RFC is the most a person can do despite her physical or mental impairments. 20 C.F.R. § 404.1545(a)(1). In formulating an RFC, the ALJ must consider all medically determinable impairments, including those that are not "severe," and evaluate "all of the relevant medical and other evidence," including the claimant's testimony. *Id.;* SSR 96-8p, *available at* 1996 WL 374184. In determining a claimant's RFC, the ALJ is responsible for resolving conflicts in the

medical testimony and translating the claimant's impairments into concrete functional limitations in the RFC. *Stubbs-Danielson v. Astrue,* 539 F.3d 1169, 1174 (9th Cir. 2008). Only limitations supported by substantial evidence must be incorporated into the RFC and, by extension, the dispositive hypothetical question posed to the vocational expert. *Osenbrock v. Apfel,* 240 F.3d 1157, 1163-65 (9th Cir. 2001).

The ALJ determined Plaintiff's physical impairments of mild osteoarthritis of the knees, degenerative changes of the lumbar spine, history of asthma, and obesity were severe and significantly limited her ability to perform basic work activities. The ALJ found the reviewing physicians' opinions Plaintiff's physical conditions were not severe or disabling unpersuasive based on the lack of access to all of Plaintiff's medical evidence, including updated radiology reports. On the other hand, the ALJ discounted Plaintiff's description of her physical limitations, finding her "allegations concerning her incapacity are not borne out by the objective evidence of record, the well-considered medical opinions, or the consistency of her own reported and demonstrated functional ability." (Admin. R. at 23.) Plaintiff does not contest these findings but complains only about the ALJ's description of Plaintiff's limitations in the absence of medical evidence supporting such limitations.

The plaintiff carries the burden of proof at steps one through four, including the intermediary step between step three and step four where the ALJ determines the RFC. *Carmickle*, 533 F.3d at 116; 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Plaintiff did not present evidence from a medical source identifying any limitations resulting from her physical ailments. Consequently, Plaintiff failed to carry her burden to establish she is limited to any great degree due to her obesity, asthma, and knee and back issues. Despite this, the ALJ found Plaintiff limited

to moderate work with additional limitations for stooping, crawling, kneeling, climbing, and exposure to pulmonary irritants. Plaintiff claims the RFC is not supported by the medical evidence and the ALJ had a duty to further develop the record to provide support for the RFC.

An ALJ has "a special duty to develop the record fully and fairly and to ensure that the claimant's interests are considered, even when the claimant is represented by counsel." *Mayes v. Massanari,* 276 F.3d 453, 459 (9th Cir. 2001). However, "[a]n ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Id.* (citing *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001). Moreover, a claimant bears the burden of establishing a disability. *See* 42 U.S.C. § 423(d)(5) (2020) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require."). Accordingly, the ALJ has no duty to develop the record regarding an impairment the existence of which is not reflected in the record as a whole.

Here, the evidence of regarding Plaintiff's physical limitations is not ambiguous and the ALJ's duty to further develop the record did not arise. Plaintiff indicated in the Report her knee and back pain limited her ability to squat, bend, stand, reach, sit, kneel, and climb stairs. While the ALJ discounted the severity of Plaintiff's reported symptoms, his limitations on Plaintiff's stooping, crawling, kneeling, and climbing are generally consistent with Plaintiff's representation in the Report. Furthermore, there is evidence from physical therapists Plaintiff had some limitations in her ability to move around; decreased range of motion, strength, motor control, and balance; and an abnormal gait pattern but that physical therapy could return Plaintiff to normal and/or pain-free activities of daily living. This evidence is not ambiguous or inconsistent with the

ALJ's finding of only minor physical limitations and the ALJ properly included the limitations in the RFC.

Plaintiff argues the record is ambiguous because it contains absolutely no opinion evidence, either from Plaintiff's treating sources or agency consultants regarding how Plaintiff's physical issues impact her ability to engage in specific activities or perform work-related tasks. Plaintiff cites no authority, however, for the proposition that a lack of opinion evidence automatically renders a record ambiguous. Rather, the cases cited by Plaintiff generally establish an ALJ may not reject clear medical evidence of limitations in favor of his own analysis of the medical records. *See e.g., Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975) (in light of uncontradicted medical opinions, "the Hearing Examiner, who was not qualified as a medical expert, should not have gone outside of the record to medical textbooks for the purpose of making his own exploration and assessment as to claimant's physical condition."); *Davis v. Colvin*, Case No. 3:15-cv-00843-SI, 2016 WL 8674265, at *8 (D. Or. Aug. 12, 2016) ("The ALJ considered and purportedly placed significant weight on the objective medical evidence throughout the decision, but failed to explain how it, or any other evidence, supports the ALJ's RFC finding that Plaintiff can stand or walk for six hours, contrary to the opinion of every physician."); *Nelson v. Astrue*, No. 11-CV-00003-JPH, 2012 WL 2847863, at *7 (E. D. Wash. July 11, 2012) ("In rejecting all of the mental limitations assessed after three psychological examinations, except for a limitation on superficial interaction with the public and coworkers, the ALJ acted as his own medical expert, substituting his opinion for the professional opinions of the psychologists regarding their exam results."); *Jones v. Astrue*, Civ. No. 09-645-AA, 2010 WL 4875700, at *2 (D. Or. Nov. 23, 2010) ("The ALJ cannot substitute his judgment for those of medical experts, particularly when the medical findings are

PAGE 35 - OPINION AND ORDER

uncontradicted."). Moreover, despite the ALJ's duty to develop an ambiguous or incomplete record, the claimant bears the ultimate burden of proving disability. Again, to the extent Plaintiff has failed to produce evidence that gives rise to a more restrictive RFC, that ALJ's failure to obtain such evidence is not legal error which compels the court to reverse the ALJ's decision. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) ("The ALJ, with support in the record, found the evidence adequate to make a determination regarding Bayliss's disability. Accordingly, the ALJ did not have a duty to recontact the doctors.")

The ALJ's RFC finding and hypothetical included restrictions which exceeded those supported by the record and, consequently, were proper. S*ee Osenbrock v. Apfel*, 240 F.3d 1157, 1164-65 (9th Cir. 2001) ("An ALJ is free to accept or reject restrictions in a hypothetical that are not supported by substantial evidence.") Because she posed a hypothetical question to the vocational expert that incorporated a proper RFC assessment, the vocational expert's testimony is substantial evidence for the ALJ's step five finding, and that finding is affirmed.

### Conclusion

The Commissioner's findings on Plaintiff's disabilities, considering the record as a whole, are supported by substantial evidence. The decision of the Commissioner is affirmed.

DATED this 30th day of August, 2021.

JOHN V. ACOSTA
United States Magistrate Judge

PAGE 36 - OPINION AND ORDER